**Micky Alan NESSETH,**
**Petitioner, Appellant,**

v.

**COMMISSIONER OF PUBLIC**
**SAFETY, Respondent.**

**No. C3–87–906.**

Court of Appeals of Minnesota.

Dec. 8, 1987.

Donald G. Clapp, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Jeanne J. Graham, Joel A. Watne, Sp. Asst. Attys. Gen., St. Paul, for respondent.

Heard, considered and decided by WOZNIAK, P.J., and NORTON and IVERSON,* JJ.

## OPINION

WOZNIAK, Chief Judge.

Appellant Micky Alan Nesseth's driver's license was revoked for an implied consent violation and, on review, the trial court sustained the revocation. Nesseth challenges the validity of the test and the sufficiency of probable cause. We affirm.

## FACTS

Officer Anthony Follen was on duty in the early morning hours of January 3, 1987, when he received a report from the dispatcher of a vehicle possibly in the ditch on Highway 52 and County Road 9. Follen saw a vehicle just off the highway, parked in the middle of a gravel township road. The lights were on, the driver's door was open, the interior light was on, and the engine was running. He could see a person, later identified as appellant Micky Alan Nesseth, slumped over. Follen at-

tempted to awaken him, and succeeded in doing so only after several attempts.

Nesseth testified that he had arisen at 4:00 a.m. to milk and feed cows at his dairy farm, had worked a full day at his construction job, and had done chores again. He then went to a bar to meet with his loan officer at approximately 9:00 p.m. to discuss financing of a home. He had three to four beers between 9:00 p.m. and 12:15 a.m. The loan officer with whom he met also testified as to these facts and that he thought Nesseth was sober when he left the bar.

Nesseth then drove towards home, taking Highway 52 and then turning onto the gravel road. He pulled over, got out of the car, then got back into his vehicle and dozed off, with the engine running and the lights on. He testified that he explained to the officer he was very tired, he lived up the road, and he just wanted to go home and go to bed.

Follen noted a very strong odor of alcohol on Nesseth's breath, and he had difficulty walking and keeping his balance. Follen had Nesseth perform two field sobriety tests, the one-legged stand and the horizontal gaze nystagmus test, both of which he believed Nesseth failed. Nesseth disputed the officer's version of the one-legged stand. He did not feel that he was intoxicated; he was just tired. Follen placed Nesseth under arrest for DWI, handcuffed him, and put him in the back seat of his squad car.

Follen had another person in his squad car, whom he had arrested, and Nesseth talked to him briefly while they were both in Follen's squad car. Another officer then took custody of the other person and transported him. Follen did not record the other prisoner's name in his arrest report.

Follen read the implied consent advisory to Nesseth at approximately 2:02 a.m. in the squad car at the scene of the arrest. Nesseth said he understood, and agreed to take the breath test. He asked to sit in the front seat because otherwise he becomes car sick, but the officer would not allow

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

him to do so. Follen then began to drive towards the Goodhue County Law Enforcement Center in Red Wing. After approximately 10 miles, Nesseth asked the officer to stop the vehicle so he could vomit. He explained to the officer that he became sick because he was nervous; he also told Follen he was tired. They then proceeded to the law enforcement center, a distance of approximately 15 more miles. He testified that he burped vomit back up after that, but did not want to ask the officer to stop again.

Follen testified that he kept Nesseth under observation for at least 15 minutes, both in the car and at the station, to ensure that he did not put anything into his mouth and that he did not burp or vomit.

Trooper Randy Bluhm administered the test at 3:07 a.m. It revealed an alcohol concentration of .10. Follen, who believed this was a relatively low result based upon his observations of Nesseth, thought he might also be under the influence of a controlled substance. He reread the implied consent advisory to him at 3:38 a.m. and asked him to take a urine test, and Nesseth agreed. The urine sample was sent to the Bureau of Criminal Apprehension for analysis.

The Intoxilyzer test record has a blank space which is to be filled in with the name or initials of the officer who has completed the observation period; in this case, that space was not filled in. Bluhm did not recall that Follen told him that Nesseth had vomited before he arrived at the jail, although Follen did tell him that he had Nesseth under observation for 15 to 20 minutes prior to the test. He explained there was a remote possibility that regurgitation of the stomach contents could affect the test. However, the Intoxilyzer can detect mouth alcohol; if it is present, the sample will not be accepted. In this case, the Intoxilyzer did not detect any mouth alcohol.

Paula Johnson, a crime laboratory analyst for the BCA, analyzed Nesseth's urine sample for alcohol content, but not for marijuana. Because of a shortage of personnel, the BCA does not run drug screening tests on samples which show an alcohol concentration of .10 or above.

The trial court sustained the revocation, finding that it was uncertain whether a full 20 minutes had elapsed between the time Nesseth vomited and the time it took the test. Because Nesseth did not show this affected his test results, it sustained the revocation.

### ISSUES

1. Did the arresting officer have probable cause to believe appellant was driving while under the influence?

2. Was the Intoxilyzer test valid and reliable?

### ANALYSIS

 1. Nesseth first challenges the police officer's determination that there was was probable cause for his arrest. The totality of the circumstances must be considered. *Eggersgluss v. Commissioner of Public Safety*, 393 N.W.2d 183, 185 (Minn. 1986). The officer had more than sufficient probable cause to arrest Nesseth for DWI. He came upon Nesseth, stopped on a gravel road, at approximately 2:00 a.m., asleep in his vehicle, with the engine running, lights on, and door open. Upon awakening him, Follen could smell a very strong odor of alcohol, and observed that Nesseth had trouble walking and keeping his balance. He also believed Nesseth failed both field sobriety tests. The facts are clearly sufficient to provide probable cause to believe Nesseth was driving while under the influence, even if there was some reason not to consider the one-legged stand field sobriety test. *See State v. Harris*, 295 Minn. 38, 41–42, 202 N.W.2d 878, 880 (1972). Nesseth's exculpatory explanation that he was tired does not preclude a finding of probable cause on these facts. *State v. Olson*, 342 N.W.2d 638, 640 (Minn.Ct.App.1984).

 2. Nesseth also argues he was prejudiced because Follen did not identify the prisoner in his squad car who witnessed the field sobriety tests. The officer had no obligation to include the name of the witness in his police report, nor does Nesseth

point to any statute or rule of law showing he was required to do so. Nesseth, who testified that he was aware another person was in the squad car at the time of his arrest, could have sought the identity of the witness through the discovery process.

3. Nesseth also challenges the reliability of the test, asserting that the observation period was insufficient and that his vomiting affected the test.

The Commissioner must establish that the administration of the Intoxilyzer test conformed to the procedures necessary to ensure reliability. He did this.

 Follen testified he observed Nesseth for at least 15 minutes. The testing officer testified that the test was in proper working order, and he believed the test was accurate. The machine did not indicate any mouth alcohol present which would invalidate the breath sample. It is then incumbent on the opponent to come forward with evidence to suggest reasons why the test was untrustworthy. *State v. Dille*, 258 N.W.2d 565, 568 (Minn.1977). None was offered.

Nesseth then challenged the validity of the test. He asserted that failure to initial the blank on the test record indicating the observation period had been properly completed made the test suspect. This was cured by the officer's testimony as to the observation period.

Nesseth also argues that the low reading of .10 and the fact that Follen questioned the low reading impugns the reliability of the test. This argument lacks merit.

Finally, Nesseth argues that the fact he vomited prior to taking the test affected the reliability of the test. The vomiting occurred 15 miles away from the Law Enforcement Center, although Nesseth did testify that he continued to "burp it back up" afterwards. Follen testified that he had Nesseth under observation while they were waiting for the test to start and did not observe anything after the vomiting. Bluhm testified that the Intoxilyzer can detect mouth alcohol, that it did not detect mouth alcohol in Nesseth's samples, and there was only a "remote

possibility" the vomiting would affect the result. There was an insufficient showing that the test results were affected by vomiting which occurred well before the test was given. *See Hounsell v. Commissioner of Public Safety*, 401 N.W.2d 94, 96–97 (Minn.Ct.App.1987).

### DECISION

The order of the trial court sustaining the revocation is affirmed.

Affirmed.